## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Case No. 17-11752 (KJC) |
| | Chapter 11 |
| SPEED VEGAS, LLC, | |
| | **Objection Deadline: September 28, 2017 at 4:00 p.m. (ET)** |
| Debtor. | **Hearing Date: October 5, 2017 at 3:00 p.m. (ET)** |

### MOTION FOR ORDER THAT THE STAY IS NOT APPLICABLE PURSUANT TO 11 U.S.C. § 362(b)(10), OR IN THE ALTERNATIVE, MOTION FOR RELIEF FROM AUTOMATIC STAY, OR IN THE ALTERNATIVE, MOTION FOR PAYMENT OF POST-PETITION OBLIGATIONS PURSUANT TO 11 U.S.C. § 365(D)(3)

Sloan Ventures 90, LLC ("Sloan Ventures" or "Landlord"), by and through its counsel, Pepper Hamilton LLP, hereby files this Motion for Order that the Stay is Not Applicable Pursuant to 11 U.S.C. § 362(b)(10), or in the Alternative, Motion for Relief from Automatic Stay, or in the Alternative, Motion for Payment of Post-Petition Obligations Pursuant to 11 U.S.C. § 365(d)(3) (the "Motion"), and states as follows:

### RELEVANT FACTS AND BACKGROUND

1.      On or about December 14, 2015, Sloan Ventures, as landlord, and Speed Vegas LLC ("Speed Vegas" or "Debtor"), as tenant, entered into that certain Ground Lease (Triple Net) (the "Lease"), attached as **Exhibit 1** to the Declaration of Scott Gragson in Support of the Motion ("Gragson Declaration"), ¶ 2, which is attached hereto as **Exhibit A**.[1]

2.      The Lease is governed by the law of the State of Nevada.  (Lease, § 17.9.)

3.      Under the Lease, Speed Vegas was to pay Sloan Ventures a security deposit in the amount of Fifty-Three Thousand One Hundred Twenty-Five Dollars ($53,125.00) on December 14, 2014, the effective date (the "Security Deposit").  (*Id.* at p.3, ¶1.34; and p. 7-8, ¶4.6.)

4.      The Lease governed Speed Vegas's tenancy of the property identified as approximately eighty-five (85) acres of land located generally at the 1-15 and Sloan Road exit,

---

[1] Exhibits 1 through 6 referred to herein are each exhibits to the Gragson Declaration.

and known as APN 191-20-301-001, APN 191-19-801-003, and APN 191-20-201-004.  (*Id.* at p. 3, ¶1.23; and further described at Lease Exhibit A, p. 27 (the "<u>Leased Premises</u>").)

5.    Under the Lease, the parties agreed to an original term of twenty-five (25) years, continuing through the twenty-fifth (25th) anniversary of the Rent Commencement Date.  (*Id.* at p. 5, ¶3.1.)

6.    The Rent Commencement Date was the sooner of substantial completion of the Initial Improvements and the issuance of a certificate of occupancy permitting the operation of the Premises as a Race Track, or December 1, 2015 (the "<u>Rent Commencement Date</u>").  (*Id.* at p. 3, ¶1.33.)

7.    The Lease commenced on December 1, 2015.  (*Id.*)

8.    For the period commencing on the Rent Commencement Date and ending on the day immediately preceding the first (1st) anniversary of the Rent Commencement Date, Speed Vegas agreed to Pay Six Hundred Thirty-Seven Thousand Five Hundred Dollars ($637,500.00), payable in equal monthly installments (the "<u>Annual Basic Rental</u>").  (*Id.* at p. 5, ¶4.1(a)(i); and p. 6, ¶4.1(b).)

9.    Commencing on the first (1st) anniversary of the Rent Commencement Date ending on the day immediately preceding the second (2nd) anniversary of the Rent Commencement Date, the Annual Basic Rental increased to Eight Hundred Twenty-Eight Thousand Seven Hundred Fifty Thousand Dollars ($828,750.00).  (*Id.* at p. 5, ¶4.1(a)(ii).)

10.    Commencing on the second (2nd) anniversary of the Rent Commencement Date and continuing through the day immediately preceding the fifth (5th) anniversary of the Rent Commencement Date, the Annual Basic Rental increases to Nine Hundred Seventy-Two Thousand One Hundred Eighty-Eight Dollars ($972,188.00).  (*Id.* at p. 5, ¶4.1(a)(iii).)

11.    Commencing on the fifth (5th) anniversary of the Rent Commencement Date and continuing through the day immediately preceding the tenth (10th) anniversary of the Rent Commencement Date, the Annual Basic Rental increases to One Million One Hundred Eighteen Thousand Sixteen Dollars ($1,118,016.00).  (*Id.* at p. 6, ¶4.1(a)(iv).)

12.     Thereafter, the Annual Basic Rent is in accordance with the Schedule of Rental Payment attached to the Lease as Exhibit D.  (*Id.* at Exhibit D.)

13.     The Lease further provides that if Speed Vegas fails to pay any Rent within five (5) calendar days after the date that such Rent was due and payable, Speed Vegas shall pay to Sloan Ventures a late charge of five percent (5%) of the amount of such overdue Rent.  (*Id.* at p. 7, ¶4.5.)

14.     In addition, any such Rent payment which is not paid more than thirty (30) calendar days after the due date shall bear interest from the original date such Rent became due and payable to the date of payment thereof by Speed Vegas at the Default Rate of ten percent (10%) per year.  (*Id.*; and p. 1, ¶1.5.)

15.     With respect to mechanic's liens, the Lease provides that Speed Vegas shall not create or permit to be created, and if created shall bond off, or contest and place reasonable security, or discharge, any mechanics' or materialmen's lien, tax lien, or judgment lien arising while this Lease is in effect whereby Sloan Ventures' estate, right and interest in any or all of the Leased Premises might be impaired.  (*Id.* at p.10, ¶6.6(b).)

16.     Furthermore, the Lease provides Speed Vegas is obligated to bond off any such lien or liens where the aggregate amount outstanding at any one time exceeds Twenty-Five Thousand Dollars ($25,000.00) (the "Threshold Amount").  Such bond shall be placed within thirty (30) days of notice to Tenant of such liens.  (*Id.*)

A.     **The First Default—Failure to Pay the Security Deposit**

17.     In early 2017, Sloan Ventures became aware that Speed Vegas failed to pay its security deposit when the Lease commenced.  (Gragson Declaration, ¶ 3.)

18.     On July 6, 2017, Sloan Ventures sent Speed Vegas a formal demand for payment of the Security Deposit.  (*Id.* at ¶ 4.)

19.     Speed Vegas did not respond to Sloan Ventures' demand.  (*Id.* at ¶ 5.)

20.     To date, Speed Vegas has not paid the Security Deposit in full.  (*Id.* at ¶ 6.)

#45513195 v1

**B.      The Second Default—Failure to Pay Rent**

21.      Pursuant to Paragraph 4.1(a)(ii) of the Lease, Speed Vegas's Annual Basic Rent increased to $828,750.00 on December 1, 2016, payable in equal monthly payments of $69,062.50.

22.      Speed Vegas did not timely pay its Rent for December 2016.  (*Id.* at ¶ 7.)

23.      On December 5, 2016, Speed Vegas paid Sloan Ventures $53,125.00, leaving a deficiency of $15,937.50 for the month.  (*Id.*)

24.      Again, Speed Vegas did not timely pay its Rent for January 2017.  (*Id.* at ¶ 8.)

25.      On January 11, 2017, Speed Vegas paid Sloan Ventures $53,125.00, leaving a deficiency of $15,937.50 for the month.  (*Id.*)

26.      Speed Vegas did not timely pay its Rent for February 2017.  (*Id.* at ¶ 9.)

27.      On February 2, 2017, Speed Vegas paid Sloan Ventures $53,125.00, leaving a deficiency of $15,937.50 for the month.  (*Id.*)

28.      Speed Vegas did not timely pay its Rent for March 2017.  (*Id.* at ¶ 10.)

29.      For March 2017, Speed Vegas again only paid Sloan Ventures $53,125.00, leaving a deficiency of $15,937.50 for the month.  (*Id.*)

30.      On or about March 24, 2017, Speed Vegas promised to pay Sloan Ventures $116,875.00, half of which was to be paid immediately and the other half was to be paid on or before April 21, 2017.  The parties agreed that amount would catch Speed Vegas up on all sums due and owing through March 2017, including both rents and the Security Deposit.  (*Id.* at ¶ 11.)

31.      Speed Vegas paid the first half of the $116,875.00, but never made the second payment of $58,437.50 on or before April 21, 2017 as promised.  (*Id.* at ¶ 12.)

32.      Speed Vegas did not pay Rent for April 2017, leaving a deficiency of $69,062.50 for the month.  (*Id.* at ¶ 13.)

33.      Speed Vegas did not pay Rent for May 2017.  (*Id.* at ¶ 14.)

34.      Speed Vegas did not pay Rent for June 2017.  (*Id.* at ¶ 15.)

35.    On July 28, 2017 and July 31, 2017, Debtor paid Sloan Ventures two partial payments of $16,114.51, leaving a deficiency of $36,833.48 for the month.  (*Id.* at ¶ 16.)

36.    Speed Vegas did not pay Rent for August 2017.  (*Id.* at ¶ 17.)

37.    In total, Speed Vegas owes Sloan Venture approximately $410,000.00 in unpaid rents between December 1, 2016 and August 1, 2017.  (*Id.* at ¶ 18.)

38.    Additionally, Speed Vegas is past due for the rent payment that was due on September 1, 2017.  (*Id.* at ¶ 19.)

**C.    The Third Default—Failure to Bond or Discharge Lien**

39.    On January 24, 2017, J.A. Tiberti Construction Co., Inc. recorded a lien against the Leased Premises in the amount of Four Million Thirty-Three Thousand Eight Hundred Thirty-One 00/100 Dollars ($4,033,831.00) with the Clark County Recorder's Office, as Instrument No. 20170124-0002559 of the Clark County Official Records (the "<u>Lien</u>").  (*See* **Exhibit 2**; Gragson Declaration, ¶ 20.)

40.    To date, Speed Vegas has failed to bond or discharge the Lien. (Gragson Declaration, ¶ 21.)

**D.    The Relevant Pre-Petition Events**

41.    On July 6, 2017, Sloan Ventures served Speed Vegas with a Five-Day Notice to Pay Rent or Quit (the "<u>Five-Day Notice</u>").  (*See* **Exhibit 3** Gragson Declaration, ¶ 22.)

42.    Speed Vegas did not vacate the Leased Premises or pay rent; rather Speed Vegas filed an answer in Justice Court for the Las Vegas Township on July 13, 2017.  (*See* **Exhibit 4 (**exhibits excluded to avoid duplication); Gragson Declaration, ¶ 23.)

43.    On August 2, 2017, Sloan Ventures filed a summary eviction/unlawful detainer action in Justice Court for the Las Vegas Township, Case No. 17E016611.  (*See* **Exhibit 5 (**exhibits excluded to avoid duplication); Gragson Declaration, ¶ 24.)  A hearing was scheduled on the summary eviction/unlawful detainer for August 14, 2017.

44.    On August 11, 2017, Sloan Ventures filed a complaint in the Eighth Judicial District Court, Clark County, Nevada, captioned Case No. A-17-758232 against Debtor and

Debtor's principal, Aaron Fessler, for breach of contract, breach of guaranty, and breach of the implied covenant of good faith and fair dealing.  (*See* **Exhibit 6 (**exhibits excluded to avoid duplication); Gragson Declaration, ¶ 25.)

45.     On August 12, 2017 (the "Petition Date") an involuntary chapter 11 petition was filed on behalf of the Debtor (the "Bankruptcy Case").

## RELIEF REQUESTED

46.     By this Motion, Landlord seeks an order that the automatic stay is not in effect, pursuant to 11 U.S.C. § 362(b)(10), so the Landlord may proceed with its summary eviction/unlawful detainer action.  Alternatively, if the automatic stay is in effect, Landlord seeks relief from the stay to proceed with the eviction.  If the Court determines that stay relief is not appropriate at this time, Landlord seeks an order that the Debtor must pay its post-petition obligations under the Lease pursuant to 11 U.S.C. § 365(d)(3).

## STANDARD FOR RELIEF

**A.     This Court should Declare that Automatic Stay is Inapplicable Here Because the Lease Terminated Prepetition.**

47.     11 U.S.C. § 362(b)(10) provides that the automatic stay of Section 362(a) does not apply to a lessor's efforts to retake nonresidential real property after the expiration of the stated term of a lease of nonresidential real estate.  11 U.S.C. § 362(b)(10).  Further, the Third Circuit Court of Appeals has found that if a lease is terminated pre-petition, the automatic stay is not applicable. *See Kopelman v. Halvajan* (*In re Triangle Laboratories*), 663 F.2d 463, 467-68, 5 C.B.C.2d 517, 522-23 (3d Cir. 1981).

48.     Congress has generally left the determination of property rights in a bankruptcy estate's assets to state law and the Bankruptcy Code further directs that the question of "termination" is to be resolved by reference to "applicable nonbankruptcy law."  11 U.S.C. § 365; *see Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Issa Corp.*, 142 B.R. 75, 77 (Bankr.S.D.N.Y.1992). In this particular context, applicable non-bankruptcy law is Nevada state law.  *See* Lease, Exhibit 1.

-6-

49.     Nevada law provides that a lease is terminated upon expiration of the cure period contained in a notice to quit, thus the Debtor's lease terminated upon expiration of the time period set forth in the Five-Day Notice.  In *Lynn v. Ingalls*, 100 Nev., 115, 676 P.2d 797 (1984), the Nevada Supreme Court stated that:

> When a lessee fails to make rental payments, the lessor may elect to declare the lease terminated and seek an unlawful detainer action to oust the defaulting tenant.  *See* NRS 40.253. . . Therefore, although the law abhors forfeiture, there is nothing repugnant to public policy in allowing for the termination of a lease and eviction of a tenant who fails to pay the rent.

*Id*. at 118-19, 676 P.2d at 800.

50.     In order to commence an unlawful detainer action in Nevada, a landlord is required to serve the tenant with a five-day notice to pay rent or quit in the manner required by Nevada Revised Statute ("NRS") § 40.280.  *See* N.R.S. § 40.253(a)(7).  The expiration of the cure period contained in the notice to quit acts to terminate the tenancy.  In *Roberts v. Second Judicial Dist. Court*, 43 Nev. 332, 185 P. 1067 (1920), the Nevada Supreme Court stated: "Before a landlord can resort to the summary remedy of an action for unlawful detainer under subdivision 2, he *must terminate the tenancy by serving a notice to quit* possession as required therein."  *Id.*, at 1069 (emphasis added).  It is clear that upon expiration of the cure period, the tenant is guilty of an unlawful detainer.  NRS § 40.2512 states:

> A tenant of real property or a mobile home for a term less than life is guilty of an unlawful detainer when he continues in possession, in person or by a subtenant, after default in the payment of any rent and after a notice in writing, requiring in the alternative the payment of the rent or the surrender of the detained premises, remains uncomplied with for a period of 5 days, . . .  The notice may be served at any time after the rent becomes due.

N.R.S. § 40.2512.  The applicable case law also supports the language contained in NRS § 40.2512 and indicates that upon the expiration of a cure period, the lease is terminated.  For example, in *Lorenz v. Beltio, Ltd.*, 114 Nev. 795, 804, 963 P.2d 488, 804 (1998), the court held that a thirty-day notice to quit that was served on December 23, 1991, terminated the lease on January 23, 1992.  The Nevada Supreme Court also reached the conclusion that a lease was

-7-

terminated thirty days after a notice to quit was served in *International Industries v. United Mortgage Co.*, 96 Nev. 150, 154, 606 P.2d 163, 166 (1980).  Indeed, the *International Industries* Court went so far as to hold that "[a]bsent legal excuse or justification, only a tender of the full amount due made before a declaration of termination can preclude the lessor from electing to terminate the lease.  A tender requires that the debtor produce the money and place it in control of the creditor." *Id*. at 156, 606 P.2d at 166.

51.     Here, the Notice was served upon the Debtor on July 6, 2017.  The Notice indicated that the Debtor had five days to either pay rent or quit.  Debtor did neither.  Thus, under Nevada law, the Lease was terminated on the expiration of the fifth day following service of the Notice.  By event the most conservative estimate, the Lease terminated on July 13, 2017.

52.     In in *In re Policy Realty Corp.*, that Court held that a lease could be terminated under New York law by operation of a "conditional limitation." 242 B.R. 121 (S.D.N.Y. 1999), aff'd, 213 F.3d 626 (2d Cir. 2000).  "The lease is terminated when the time expires, rather than on any further act by the landlord." *Id.*  Therefore, when the tenant failed to meet the conditional limitation in the notice of termination, the *Policy Realty Corp.* Court concluded that "the Net Lease and Policy's sublease are not property of the estate and are not protected by the automatic stay." *Id.*

53.     In *In re Foote*, 277 B.R. 393 (Bankr. E.D. Ark. 2002), the Court reached the same result as the *In re Policy Realty Corp.* court.  The Arkansas Court held that the lease was terminated upon the debtor's receipt of the notice to quit.  Therefore, the lease was not property of the estate, and could not be assumed or rejected by the debtor under 11 U.S.C. § 365.

54.     Here, the Lease was terminated when the Debtor failed to either vacate or pay rent on the fifth day following service of the conditional Notice to Quit or Pay Rent.  The Debtor failed to meet the condition set forth in the notice, which was to pay rent, and that failure terminated the Lease.  Therefore, as the Debtor had no interest in the Lease as of the Petition Date, the automatic stay is inapplicable.  As a result, the Landlord is requesting an order from the Court that the automatic stay does not apply and that the Landlord may pursue its state law rights

#45513195 v1

and remedies including, but not limited to, eviction.

**B.      If the Automatic Stay Does Apply Here, the Court Should Terminate the Stay.**

55.      If this Court holds that the automatic stay is applicable, the termination of Debtor's legal interest under the Lease upon expiration of the cure period contained in the Notice is sufficient cause to terminate the stay.  *See In Re Escondido West Travelodge* 52 B.R. 376 (S.D.Ca1.1985) (holding that a lease was terminated upon the filing of an unlawful detainer action, and therefore the stay must be lifted.) One court went so far as to note that these motions are generally held on shortened notice and almost never lost.  *In re Smith*, 105 B.R. 50, 52-53 (Bankr. C.D. Cal. 1988).

**C.      In the Alternative, the Court should Order the Payment of Post-Petition Obligations.**

56.      If the Court determines that the lease is unexpired and does not terminate the automatic stay, then the Court should order the immediate payment of the post-petition lease obligations pursuant to 11 U.S.C. §§ 363(e) and 365(d)(3).  Under Section 363(e) "an entity that has an interest in property used, sold or *leased*, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or conduction such use, sale, or lease as is necessary to provide adequate protection of such interest."  (emphasis added.)  Bankruptcy Courts have held that "real property lessors may request adequate protection under Section 363(e)." *In re Ernst Home Ctr., Inc.,* 209 B.R. 955, 966 (Bankr. W.D. Wash. 1997)(holding that a landlord was entitled to adequate protection in the form of post-petition rent payments and a potential priority claim if those payments were not made);  *In re Rebel Rents, Inc*., 291 B.R. 520, 532 (Bankr. C.D. Cal. 2003) (holding that lessor was entitled to the monthly rental payments pursuant to Section 363(e)).

57.      Here, the Landlord is entitled to the post-petition rental payments and obligations as adequate protection.  The Debtor is currently occupying the Leased Premises and should be required to immediately start making its monthly rental payments as adequate protection for this use.

#45513195 v1

58.     Payment of the post-petition obligations is further supported by 11 U.S.C § 365(d)(3) which mandates that trustees and debtors-in-possession are required to perform all obligations of a lease of non-residential real property from and after the order for relief.  *In re Goody's Family Clothing Inc.,* 610 F.3d 812, 816 (3d Cir. 2010) (the bankruptcy code requires a trustee to timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected).  11 U.S.C § 365(d)(3) requires that debtors pay the full contract amount of post-petition lease payments until the lease is either assumed or rejected.[2]  Although this case is an involuntary, and the order for relief has not been entered, the Landlord should still be provided with post-petition payments.  Indeed, Section 303(f) provides that the Court may order that the Debtor to comply with provisions of section 363:

> "Notwithstanding section 363 of this title, *except to the extent that the court orders otherwise*, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced."

Under the facts of this case, the Court should order that the Debtor be required to make post-petition adequate protection payments.  The involuntary petition has placed the Landlord in a much worse position than if it would have been had the involuntary either not been filed (as it would have obtained possession of the Leased Premises) or if a voluntary petition had been filed (in which case performance of the post-petition obligations would have been guaranteed pursuant to Section 365(d)(3)). Under these unique circumstances, the Court can and should order that the Landlord is entitled to adequate protection in the form of present and timely lease payments.

59.     If the Court is not so inclined to require the Debtor to make adequate protection payments during the gap period, the Landlord is entitled to a gap priority administrative claim for the Debtor's post-petition occupancy of the Leased Premises.  In an involuntary case such as this

---

[2] Although this is an involuntary petition, and thus the order for relief has not been entered, the Landlord is still entitled to the post-petition obligations as adequate protection.

#45513195 v1

one, a claim arising in the ordinary course of the debtor's business...after commencement of the case but before the...order of relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b) or (c) of this section or disallowed under subsection (d) or (e)...11 U.S.C. §502(f). Additionally, the administrative expense claim is not allowed on the basis of the existence of a lease, but rather, is based on the fair rental value of the property during the possession by the debtor post-petition.  *See In re Thayn Farm, Inc.*, 117 B.R. 510, 514-515 (Bankr. D. Neb. 1988) (allowing administrative claim to lessor after expiration of leases, based on debtor's continued possession and use of the property); *In re Aerospace Technologies, Inc.*, 199 B.R. 331 (Bankr. M. D. N.C. 1996) (no requirement that there be an express agreement between the trustee and the owner of the property).

60.     The amount of the allowable administrative expense is valued under an objective worth standard that measures the fair and reasonable value of the use of the property on the open market, and the rent reserved under the lease is presumptive evidence of that fair and reasonable value. *In re Williams Contract Furniture, Inc.*, 148 B.R. 799, 804 (Bankr. E. D. Va. 1992); *In re Thompson*, 788 F.2d 560, 563 (9th Cir. 1986).

61.     By continuing its use of the Leased Premises post-petition, Debtor has acknowledged implicitly its need for the Leased Premises in its ongoing business operations. Given the presumptive reasonableness of the contract rate of rent set forth in the Lease as the fair market value for Debtor's continued use of the Leased Premises, Landlord should be awarded its administrative gap claim in the amount of the contract rate of rent set forth in the Lease.

## CONCLUSION

62.     For the reasons detailed above, it is respectfully requested that this Court grant the Landlord's requested relief[3] and (a) enter an Order, substantially in the form attached hereto as **Exhibit B**, confirming that the automatic stay does not apply; or, in the alternative, find either

---

[3] By seeking the relief requested herein, Landlord is not foregoing, and reserves all rights with respect to, an administrative claim for all amounts that have arisen in the administrative gap period between the filing of the involuntary petition against the Debtor and the entry of an order for relief.

#45513195 v1

(b) that the Landlord is entitled to relief from the automatic stay, or (c) that the Debtor immediately commence paying its post-petition obligations or that the Landlord be awarded its administrative gap claim in the amount of the rate of rent set forth in the Lease.

Dated:  September 12, 2017          **PEPPER HAMILTON LLP**

                                        */s/ Michael J. Custer*
                                        Henry J. Jaffe (DE No. 2987)
                                        Michael J. Custer (DE No. 4843)
                                        Hercules Plaza, Suite 5100
                                        1313 N. Market Street
                                        Wilmington, Delaware  19899-1709
                                        Telephone:    (302) 777-6500
                                        Facsimile:    (302) 421-8390
                                        E-mail:       jaffeh@pepperlaw.com
                                                               custerm@pepperlaw.com
                                        and

                                        **SNELL AND WILMER  L.L.P.**
                                        Robert R. Kinas, Esq.
                                        3883 Howard Hughes Parkway #1100
                                        Las Vegas, NV 89169-5958
                                        Telephone:    (702) 784-5203
                                        Email:         rkinas@swlaw.com

                                        *Counsel to Sloan Ventures 90, LLC*

#45513195 v1