**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPEED VEGAS, LLC,[1] | Case No. 17-11752 (KJC) |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:
(I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION SECURED
FINANCING; (II) AUTHORIZING THE USE OF CASH COLLATERAL;
(III) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (IV) SCHEDULING A
FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Speed Vegas, LLC (the "Debtor" or the "Borrower"), by and through its

undersigned counsel, hereby moves for the entry of interim and final Orders: (I) authorizing the

Debtor to obtain post-petition secured financing; (II) authorizing the use of cash collateral;

(III) granting liens and superpriority claims; (IV) scheduling a final hearing; and (V) granting

related relief (the "Motion").  In support of the Motion, the Debtor respectfully represents:

**PRELIMINARY STATEMENT**

1.      The Debtor makes this motion pursuant to sections 105(a), 364(c) and

364(e) of Title 11 of the United States Code (the "Bankruptcy Code") and Fed. R. Bankr. P.

4001 and 9014, on an interim and final basis, seeking:

      I.     authorization for the Borrower to obtain up to $600,000 in principal amount of new post-petition financing (the "DIP Financing") on the terms and conditions set forth in the proposed interim order annexed hereto as **Exhibit A** (the "Interim Order") and the Debtor-in-Possession Credit Agreement[2] to be executed and delivered (as hereafter amended, supplemented or otherwise modified from time to time in accordance with

---

[1] The last four digits of the Debtor's Tax Identification Number are 8686. The Debtor's corporate address is 14200 South Las Vegas Blvd., Las Vegas, NV 89054.

[2] Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Interim Order.

the terms hereof and thereof, the "DIP Agreement"[3]; together with all agreements, documents and instruments delivered or executed in connection herewith or therewith, in each case as hereafter amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Documents"), among the Borrower, the lenders from time to time party thereto (collectively, the "DIP Lenders"), and Lance Harris, in his capacity as Administrative Agent and Collateral Agent for the Lenders (the "DIP Agent");

II.     authorization for the Debtor to "roll-up" the Gap Period Loan (as defined in this Motion), bringing the total amount of the DIP Financing to $800,000;

III.    authorization for the Debtor to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

IV.     authorization for the Debtor to borrow and use up to $250,000 during the period from the entry of the Interim Order and the entry of the Final Order (the "Interim Advance");

V.      authorization for the Debtor to use the DIP Lenders' Cash Collateral as well as all other DIP Collateral, and the Cash Collateral of the lenders under the Senior Loan, in each case subject to the terms and conditions of the Interim Order;

VI.     to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the Interim Order;

VII.    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing for this Court to consider entry of a final order approving the Motion, which order shall be substantially in the form of the Interim Order and otherwise contain terms and conditions acceptable to the DIP Agent in its sole discretion (the "Final Order");[4] and

VIII.   to grant the Debtor such other and further relief as the Court may deem just and proper.

---

[3] The Debtor relies on the DIP term sheet attached hereto as **Exhibit B** (the "DIP Term Sheet") for the interim relief requested and anticipates filing the final proposed form of DIP Agreement no later than three (3) days prior to the final hearing on the relief requested. The DIP Lenders have waived the confidentiality provisions of the DIP Term Sheet.

[4] As discussed in this Motion, the Debtor will seek authorization to grant the DIP Lenders liens on the proceeds of Avoidance Actions in the Final Order.

## BACKGROUND

2.     An involuntary petition was filed against the Debtor on August 12, 2017.
The Debtor consented to the entry of an order for relief under Chapter 11 of the Bankruptcy
Code, and that Order was entered on December 12, 2017 (the "Petition Date").  The Debtor
continues to operate its business and manage its assets as a debtor-in-possession pursuant to
sections 1107 and 1108 of the Bankruptcy.  No trustee or examiner has been appointed in this
case, and as of the date hereof, no creditors' committee has been appointed.

3.     The factual background relating to the Debtor's business and operations,
the events leading to the involuntary bankruptcy filing and the Debtor's decision to consent to
the entry of an order for relief are contained in the *Declaration of Aaron Fessler in Support of
the Debtor's Voluntary Chapter 11 and Requests for First Day Relief* (the "First Day
Declaration"), which is incorporated herein by reference.

**The Development of the Business**

4.     As described in greater detail in the First Day Declaration, the Debtor
commenced its business in September of 2007 as a private car club, whose members paid an
annual fee in order to be able to drive exotic cars in the company's collection.  By 2011,
however, the management and owners of the company had begun exploring other approaches to
the exotic car business, and from 2011 until mid-2015, the Debtor provided exotic car driving
experiences to the public.

5.     By 2014, the management and owners of Speed Vegas had determined
that the best path forward for the business was to develop a permanent car racing facility in or
near Las Vegas, Nevada.  On December 15, 2014, the Debtor entered into a twenty-five year,
triple net ground lease with Sloan Ventures 90, LLC (the "Landlord") for approximately eighty-

five acres of land in Las Vegas.  Per the terms of the Lease, rent payments commenced on

December 1, 2015.  Effective December 1, 2017, lease rent is $972,188.00 per year, or

$81,015.66 per month.

6.      After entering into the Lease, Speed Vegas contracted with J.A. Tiberti

Construction Co., Inc. ("Tiberti Construction") to develop the leased property as a 1.5 mile

racetrack, with adjoining buildings that would provide a retail shop, a café and event space, and

terraces overlooking the racetrack.  The construction work was scheduled to be completed on or

about March 20, 2016.

7.      The Speed Vegas track opened to the public in mid-April of 2016, but the

facility was only partially completed at that time. Due to delays on the part of Tiberti

Construction, construction was not fully completed until September of 2016, at a cost that

significantly exceeded the original contract price.  In addition, because the facilities were not

completed on schedule, Speed Vegas incurred substantial costs for staff that was not needed,

equipment rentals that were not necessary and refunds to customers for the almost six months

between the scheduled completion date and the actual completion date.

8.      By the autumn of 2016, however, the Speed Vegas facilities were fully

operational.  The Debtor was able to offer customers the experience of driving high-end sports

cars such as Porsches, Lamborghinis and Ferraris -- generally referred to as "exotic cars" or

"super-cars" by driving aficionados -- on its 1.5 mile track, as well as access to a café and event

space, a gift shop, and multiple viewing terraces adjoining the track. The company offered

individuals the choice of driving one car, or purchasing a package containing multiple options,

and offered group packages for corporate events, bachelor parties and other occasions.

**Prepetition Senior Secured Financing**

9.      On or about March 18, 2016, the Debtor entered into a Note and Warrant Purchase and Security Agreement, which, among other things, provided a senior secured loan to the business in the principal amount of five million dollars ($5,000,000) (the "Senior Loan"). The Senior Loan is secured by liens and security interests in all of the assets owned (or thereafter acquired) by the Debtor and the products and proceeds of the same, excepting vehicles, and Lance Harris, Esq. is the collateral agent for the lenders.[5] None of the principal amount of the Senior Loan had been repaid as of the Petition Date and the Debtor is not current in the payment of interest.

**Vehicle Financings**

10.     The Debtor has a single, wholly-owned subsidiary called SLV Automobiles, LLC ("SLV Auto").  SLV Auto is a non-operating company that together with the Debtor, entered into a.Revolving Credit and Security Agreement (the "Vehicle Financing Line") dated as of March 15, 2016, pursuant to which the borrowers could borrow up to $1.5 million in order to finance the purchase of the vehicles used in the Debtor's business. As of the Petition Date, less than two-thirds of that amount had been drawn.  The Vehicle Financing Line is secured by the vehicles purchased with the borrowed funds, all of which are held in the name of SLV Auto and used in the day-to-day business of the Debtor's business.  There are also several significantly smaller vehicle financing arrangements to which either the Debtor or SLV Auto is a party. Those lenders also have liens on the vehicles for which they provided financing.

---

[5] As stated in the First Day Declaration, all of the lenders under the Senior Loan are also equity holders in the Debtor, and Aaron Fessler, the CEO of the Debtor, is also an equity holder and a Senior Lender.  In addition, the principals of the Landlord are members of Sloan-Speed, LLC, a preferred equity holder and a Senior Lender, and the principals of Tiberti Construction are the members of T-VV LLC, which is also a preferred equity holder and a Senior Lender.

**The Events of 2017**

11.     The Debtor was largely able to pay its regular operating expenses after its facilities were fully operational, but due in significant part to the delays in the completion of construction and the costs to the Debtor (including additional construction costs) that resulted from those delays, Speed Vegas was not able to fully pay the costs of construction.  Almost $4.5 million was paid to Tiberti Construction, but on January 24, 2017, Tiberti Construction filed a mechanics' lien on the real property for the balance of the claims it asserted --$4,033,831.00.

12.     In February of 2017, an accident at the track resulted in the deaths of two people: A customer who was driving and a company employee who was in the passenger seat. That tragic event resulted in the closing of the track for twelve days.  The track re-opened on February 23, 2017, but the business was of course adversely affected by the accident and the closure.  Refunds totaling about $200,000 were issued as a result of the twelve day closure and additional cancellations, and lawsuits have been filed in connection with the accident.  And on March 17, 2017, a few weeks after the track's re-opening, the Landlord issued a notice of demand for (i) payment of a security deposit, (ii) payment of rent and (iii) bonding or discharge of the Tiberti Construction mechanics' lien.

13.     The Debtor immediately initiated negotiations involving the Landlord, Tiberti Construction and the Debtor's senior secured lenders, to see if matters could be resolved, and by April of 2017, there was a settlement in principle.  However, issues arose during the process of documenting the settlement, and on June 20, 2017, Tiberti Construction filed a lawsuit against the Debtor and the Landlord in the District Court for the State of Nevada.  That action was voluntarily dismissed by Tiberti Construction on July 24, 2017, after the Landlord satisfied the mechanic's lien.

14.     The Debtor continued to communicate with the Landlord in an effort to reach a negotiated resolution, but on or about July 6, 2017, the Landlord served Speed Vegas with a notice to pay rent or quit the premises.  Speed Vegas responded by filing an answer in Justice Court for the Las Vegas Township on July 13, 2017, and on August 2, 2017, the Landlord filed a summary eviction/unlawful detainer action in the same court.[6]  A hearing on the summary eviction/unlawful detainer action was scheduled for August 14, 2017.

**The Involuntary Bankruptcy Filing**

15.     On August 12, 2017, an involuntary chapter 11 petition was filed against Speed Vegas by the collateral agent on behalf of the lenders under the Senior Loan.  (The Debtor had failed to make a scheduled interest payment under the Senior Loan.) That filing stayed the hearing before the Las Vegas Justice Court, and the Debtor's business continued to operate while the Debtor reviewed operations and financial results and investigated the possibility of obtaining debtor-in-possession financing. The Debtor and the petitioning creditors consensually extended the Debtor's deadline in which to respond to the involuntary while that process was underway.

16.     By late October of 2017, the Debtor had determined that a voluntary chapter 11 made sense for the business, and had reached an agreement in principle with certain of its senior lenders with respect to debtor-in-possession financing.  Speed Vegas therefore appeared in the involuntary case, and at a hearing that was held on October 30th, advised the Court of its anticipated timetable for finalizing DIP financing terms and converting the involuntary case to a voluntary Chapter 11.

17.     The Court had been prepared to conduct a hearing on October 30th as to the Landlord's Motion for Order that the Stay is Not Applicable Pursuant to 11 U.S. C. §

---

[6] The Landlord also filed a separate action in a different court, against both Speed Vegas and its Chief Executive Officer.

362(b)(10), or in the Alternative, Motion for Relief from Automatic Stay, or in the Alternative,

Motion for Payment of Post-Petition Obligations Pursuant to 11 U.S.C. §365(D)(3) (the

"Landlord Motion"), which the Landlord had filed on September 12, 2017.  The petitioning

creditors had opposed that motion and discovery had been conducted in advance of the October

30th hearing date.  However, during a Chambers conference which was held on that date, the

parties reached an agreement that was subsequently memorialized in a negotiated form of order.

18.     The Order, which was entered on November 16, 2017, provided, among

other things, that: (i) the deadline for the Debtor to respond to the involuntary was extended

through December 11, 2017; and (ii) if an order for relief was entered by December 12, 2017 and

Speed Vegas continued to meet its Lease obligations to pay rent and maintain insurance, the

Landlord Motion would be adjourned until a date on or after April 13, 2018.  The Order also set

a status conference for December 14, 2017.

19.     The company arranged for a loan from certain of its Senior Lenders, in the

amount of $200,000 in order to insure that it would have sufficient cash for payment of

professionals in connection with the preparation for the voluntary chapter 11, and for certain

business expenses and capital improvements through the Petition Date (the "Gap Period Loan").

That loan was effected as an amendment to the existing Senior Loan. It was contemplated that

the Gap Period Loan provided would be "rolled-up" into the DIP loan.

20.     In addition, after good faith, arms-length negotiations regarding the terms

and conditions of the proposed loan, including the dollar amount, maturity date, interest rate,

deadlines and other lender protections, the Debtor finalized a term sheet with its proposed DIP

Lenders, who are largely the same parties who made the Gap Period Loan.  Management and, at

the request of the company, counsel, subsequently contacted a variety of lending bases including

Case 17-11752-KJC    Doc 80    Filed 12/12/17    Page 9 of 17


a traditional bank lender, a liquidator that is known for handing debtor-in-possession loans, and at least one equity fund. Information about the Debtor's business, assets and liabilities were provided to each, and the Debtor received no expressions of interest from any party other than the proposed DIP Lenders.

### THE SALIENT TERMS OF THE PROPOSED FACILITY AND DISCLOSURES PURSUANT TO LOCAL BANKRUPTCY RULE 4001-2

21.    As set forth above, the DIP Lenders are a subset of the Debtor's primary prepetition, secured lenders, and the DIP Agent is also the Collateral Agent under the existing prepetition secured facility.  Following the filing of the involuntary petition, the DIP Lenders agreed to extend the Debtor $200,000 in additional secured financing to enable the Debtor to prepare for a voluntary Chapter 11 case and pay certain business expenses and capital expenditures.  It was contemplated from the outset of the Gap Period Loan that the Debtor would seek to roll up the Gap Period Loan amount into the Debtor's ultimate DIP financing facility.

22.    The Debtor evaluated its cash position during the Gap Period, and based on the anticipated cash needs of the Debtor for the post-petition period, as evidenced in the Budget attached hereto as **Exhibit C**, determined that it is necessary for the Debtor to secure financing in order to achieve a successful reorganization in Chapter 11.  The following is a summary of the salient terms of the proposed post-petition financing facility from the DIP Lenders, as well as financing terms required to be identified pursuant to Bankruptcy Rule 4001(c) and Local Bankruptcy Rule 4001-2.  It is submitted that these terms are necessary, justified and reasonable under the circumstances of the case:[7]

---

[7] Capitalized terms used in the summary but not otherwise defined in the Motion shall have the meanings assigned to them in the Interim Order.  To the extent that the summary and the terms of the Interim Order conflict or are inconsistent, the terms of the Interim Order shall control and govern.

a. <u>Commitment</u>.  A senior secured, superpriority revolving credit facility (the "<u>DIP Facility</u>") in the aggregate amount not to exceed $800,000, inclusive of the roll-up of the Gap Period Loan.

b. <u>Interest, Economic Terms and Fees</u>.  The DIP Agreement contemplates that the following fees shall accrue to the DIP Facility balance: (i) a Closing Fee of $15,000 that shall be fully earned at Closing; (ii) A Commitment Fee of 5.0% per annum charged on the average unused portion of the DIP Credit Facility, earned monthly; and (iii) An Administrative Fee in the amount of $5,000 per month the first of which is earned at Closing, and earned on the first day of each subsequent calendar month thereafter. Interest will accrue at the rate of eighteen percent (18%) and the default rate of interest will be an additional two percent (2%).

c. <u>Identity of Lender</u>.  EME Finance, LLC.

d. <u>Roll-Up of Gap Period Loan</u>.  Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use post-petition loans to repay prepetition debt.  The DIP Loan Documents provide for the "roll-up" of the outstanding obligations arising under or in connection with the Gap Period Loan.  The terms do not contemplate the repayment of that loan, however, until the Maturity Date of the DIP Loan.

e. <u>Interim Advance</u>. The Debtor seeks an Interim Advance of $250,000 and provides for the immediate effectiveness of the Interim Order and waives any applicable stay to permit such immediate effectiveness.

f. <u>Liens to be Granted to DIP Lenders Including Liens on Proceeds from Avoidance Actions</u>. The DIP Lenders will be granted valid first priority, senior security interests in, and liens on all assets of the Debtor and other property acquired and/or created by the Debtor from and after the Petition Date (the "<u>Post-Petition Collateral</u>"), subject only to the Prior Permitted Liens. Pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the Debtor is to grant to the DIP Lenders valid, binding, enforceable, unavoidable and fully perfected security interests and liens (collectively, the "<u>DIP Liens</u>") in, against, and upon all prepetition and post-petition real and personal, tangible and intangible property and assets of the Debtor of any kind or nature whatsoever, wherever located, whether now existing or hereafter acquired or arising, including, without limitation, all cash (including all Cash Collateral, wherever held), cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, goods, fixtures, real property interests, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, if any, all inter-company notes held

by the Debtor, trademarks, trade names, licenses, rights to payment including tax refund claims, and causes of action (excluding actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550, 552(b) and 553 of the Bankruptcy Code (the "Avoidance Actions")), but, subject to entry of the Final Order, including the proceeds and recoveries from the Avoidance Actions (the "Avoidance Action Proceeds"),  and, upon entry of the Interim Order, including avoidance actions under section 549 and related proceeds and recoveries under section 550 of the Bankruptcy Code in respect of the DIP Collateral, and the proceeds, products, offspring, rents and profits of all of the foregoing, including insurance proceeds (all of the foregoing, collectively, the "DIP Collateral"), subject only to the Permitted Liens.

g.  Superpriority Administrative Claim.  The Obligations arising under or in connection with the DIP Facility (including for fees, costs and expenses described herein of the DIP Agent, Collateral Agent and the Lenders, the "DIP Claims") shall constitute allowed administrative expense claims equal in priority to a claim under section 364(c)(1) of the Bankruptcy Code, and except as otherwise provided in the Interim Order with respect to the Carve-Out shall have priority over all other costs and expenses of administration of any kind and be payable from and have recourse to all assets and property of the Debtor, including, subject to entry of the Final Order, the proceeds of any avoidance actions.

h.  Prior Permitted Liens.  The DIP Liens will be subject and subordinate to any perfected vehicle financing liens in place as of the Petition Date.

i.  Carve-Out.  The DIP Liens and the Superpriority Administrative Claim shall be subject to a carve-out for the payment of U.S. Trustee fees, Court costs and professional fees, as set forth in the Interim Order.

j.  Timing.  All obligations under the DIP Facility, accrued or otherwise, would be due and payable in full within thirty (30) days from Closing, unless a Final Order has been entered approving the DIP Facility on a final basis.  Upon entry of a Final Order, the Termination Date would be the earliest of (i) 7 months from Closing; (ii) an event of default by the Borrower as specified under the proposed DIP Facility documents; or (iii) the closing of the sale of all or substantially all the assets of the Borrower.  The Final Order must be final within 15 days of its entry, not subject to any stay, and acceptable to Agent in its reasonable discretion.

k. <u>Conditions to Funding</u>.  The Closing on the DIP Facility shall be conditioned upon satisfaction of the following conditions precedent as well as other conditions customary of transactions of this type: (i) All necessary consents and approvals to the financing shall have been obtained; (ii) Receipt of an acceptable Debtor-in-Possession weekly Budget for the first thirteen weeks and rolling thereafter; (iii) Bankruptcy Court shall grant adequate protection with respect to the Senior Loan until the final roll-up of the Existing Credit Facility into the DIP Facility (which adequate protection shall include payments with respect to interest payable under the Senior Loan, replacement liens on collateral, and indemnity payments); (iv) Any other information (financial or otherwise) reasonably requested by the Agent shall have been received by the Agent and shall be in form and substance reasonably satisfactory to the Agent; and (v) Execution and delivery of such documentation (to include financing statements, security agreements, non-offset letters, tax lien, litigation searches, good standing certificates, customary representations, warranties, covenants, events of default, indemnification, instruments, insurance, and opinions of counsel and such other acts as Agent may request in order to obtain Agent's legal approval to effect the completion of the financing arrangements herein contemplated) satisfactory in form and substance to Agent and its counsel.

l. <u>Events of Default</u>.  The DIP Term Sheet sets forth a number of customary Events of Default relating to, among others, entry of an order modifying the order approving the post-petition financing facility, appointing a trustee or an examiner with expanded powers in the case, sale of all or substantially all of the Debtor's assets or conversion or dismissal of the case

m. <u>Indemnification</u>.  The DIP Term Sheet contains an indemnification provision in favor of the DIP Lenders and certain other parties for claims pertaining to the DIP Loan, including an agreement that the Debtor will indemnify and hold harmless the indemnified parties in connection with the post-petition financing facility and documents, and related matters.

## THE DEBTOR REQUIRES POST-PETITION FINANCING IN ORDER TO CONTINUE OPERATIONS

23.     To fund needs critical to the administration of the case and ensure

continued operation of the business during the post-petition period, the Debtor has negotiated the

terms of this financing facility, as reflected in the Budget.  Upon approval by this Court, the DIP

Agent will make new loans and advances to the estate up to an amount not to exceed $600,000,

for a total loan of $800,000, subject to the terms of the Budget.  Interest will accrue on all

advances at the non-default rate of eighteen (18%) percent per annum.

      24.      The Debtor proposes to grant the DIP Liens and the Super-Priority Claims

pursuant to section 364(c) of the Bankruptcy Code.  Post-petition financing that the Debtor obtains

from the DIP Agent and the DIP Lenders will be secured (a) under section 364(c)(2), by all

unencumbered property of the Debtor as of the Petition Date and post-petition property of the

Debtor, and (b) under section 364(c)(3), by perfected senior liens on all of the Debtor's assets,

exclusive of assets subject to Permitted Liens.  (The DIP Lenders will have liens junior solely to the

Permitted Liens on such assets.).  The DIP Liens and the Superpriority Administrative Claims of the

DIP Agent and DIP Lenders granted in connection with the DIP Facility will be subordinate to the

Carve-Out described in the Interim Order.

### Grounds for Approval of Interim and Final DIP Borrowing.

      25.      The Debtor seeks approval of interim and final borrowing pursuant to the

terms of the DIP Agreement and the Interim Order.  It is submitted that approval of this

borrowing is in the best interest of the estate and its creditors and should be approved.

      26.      Obtaining credit is governed by section 364 of the Bankruptcy Code,

which provides in relevant part:

  (c) If the trustee is unable to obtain unsecured credit allowable under section
503(b)(1) of this title as an administrative expense, the court, after notice and a
hearing, may authorize the obtaining of credit or the incurring of debt –

                     *   *   *   *

    (2) secured by a lien on property of the estate that is not otherwise
subject to a lien; or

    (3) secured by a junior lien on property of the estate is subject to a lien.

  (e) The reversal or modification on appeal of an authorization under this section to

obtain credit or incur debt, or of the grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

27.     It is respectfully submitted that the estate meets the statutory criteria to obtain the relief requested.  The Debtor does not have sufficient cash on hand or receivables subject to collection in the next few months to take it through the Chapter 11 process which will allow it to address its financial and operational issues. Because of its difficult financial situation, the Debtor is unable to obtain funding other than post-petition financing in accordance with section 364 of the Bankruptcy Code.  With regard to the terms and conditions of the financing facility itself, it is respectfully submitted that the terms and conditions are reasonable in light of the emergent circumstances of this case. The fees and interest rates set forth in the DIP Agreement are more favorable than those generally seen in DIP loan facilities, while the events of default and other conditions are of the type that are customary in Chapter 11 cases.

28.     The Debtor has shown ample cause for approval of the proposed borrowing.  As evidenced by the Declaration of Aaron Fessler, filed contemporaneously herewith, the financing is vital to the Debtor and the Debtor has determined, after considerable effort to solicit loans from other parties, that the terms offered by the DIP Agent are the best (and only) terms available to the Debtor.

29.     Finally, the financial accommodations hereunder were negotiated at arms' length and in good faith between the Debtor and the DIP Lenders.  The terms and conditions of the financing facility have been the subject of considerable negotiation between the parties and are reasonable under the circumstances, particularly given the Debtor's financial condition. Moreover, the Motion provides appropriate notice to creditors and other parties in interest and an

opportunity for such parties to object to the relief requested herein.  Accordingly, it is submitted

that the DIP Lenders are entitled to the protections set forth in section 364(e) of the Bankruptcy

Code.

### The Debtor Requires Interim Financing

30.     Pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy

Procedure, the final hearing on this Motion may be commenced no earlier than fifteen days after

service thereof.  As previously noted, there is a critical need for financing on an interim basis in

order to maintain the Debtor's operations.  Consequently, the Debtor seeks interim relief prior to

the fifteenth day following the service of this Motion.

31.     The Debtor submits that creditors will not be prejudiced by interim relief

because such relief is necessary to protect and preserve the assets for the benefit of the estate and

its creditors and prevent irreparable harm to the going concern value of the business.  The Debtor

hereby requests that the Court schedule an interim hearing on this Motion.

### Adequate Protection in Connection With Senior Loan

32.     Section 364(d) of the Bankruptcy Code allows a debtor to obtain financing

that is secured by a senior or equal lien on property of the estate that is subject to a lien only if,

among other things, the debtor grants adequate protection to the existing lienholder.  Section 361

of the Bankruptcy Code provides examples of what may include adequate protection, including

cash payments to the existing lienholder, or replacement liens to protect the diminution in value

of the existing lien holder's interest in the property.

33.     In this instance, the liens and security interests of the prepetition lenders

under the Senior Loan are being primed by the liens granted to the DIP lenders.  As such, the

collateral agent for the prepetition lenders and the Debtor have agreed that the prepetition lenders

under the Senior Loan will receive adequate protection equal to the interest payments under the Senior Loan, which is necessary to protect the prepetition lenders against the diminution in the value of their collateral.  However, those adequate protection payments will accrue (rather than be paid in cash) during the chapter 11 case, and the amount of the accrued adequate protection payments will be added to the amount of the Senior Loan, with liens and security interests on that loan junior only to DIP Liens and the Carve-Out under the DIP Loan.   As such, this agreement provides the prepetition lenders with the appropriate adequate protection, while preserving the Debtor's much needed liquidity during the term of this bankruptcy case.

### Notice

33.     Notice of this Motion has been given to: (a) counsel to the DIP Agent, (b) any party known to assert a lien in the Debtor's assets, (c) the 20 largest unsecured creditors in this case, (d) any party having filed a Notice of Appearance in this case as of the date hereof; and (e) the Office of the United States Trustee.  The Debtor respectfully submits that no further or other notice need be provided under the circumstances of this case.

### No Previous Request

34.     No previous application for the relief sought herein has been made to this or any other court.

### CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter an order granting the relief requested herein and such other and further relief as is just and proper.

**BIELLI & KLAUDER, LLC**

Dated: December 12, 2017
       Wilmington, Delaware

*/s/ David M. Klauder*
David M. Klauder (No. 5769)
1204 N. King Street
Wilmington, DE 19801
Phone: 302-803-4600
Fax: 302-397-2557
dklauder@bk-legal.com

-and-

Alan D. Halperin, Esq.
Donna H. Lieberman, Esq.
Julie Dyas Goldberg, Esq.
**Halperin Battaglia Benzija, LLP**
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Facsimile: (212) 765-0964
Email: ahalperin@halperinlaw.net
Email: dlieberman@halperinlaw.net
Email: jgoldberg@halperinlaw.net

*Proposed Counsel to the Debtor*